OPINION
{¶ 1} Gregg A. Myers was convicted by a jury in the Darke County Court of Common Pleas of two counts of aggravated murder, in violation of R.C. 2903.01(A), and one count of aggravated burglary, in violation of R.C. 2911.11(A)(1), each with multiple specifications. The victims were Myers's father and step-mother, Jack and Linda Myers, who were shot while they slept at their home on March 27, 2003. The aggravated murder count regarding Jack Myers (Count I) included four specifications: that Myers had used a firearm during the commission of the offense; that he had a firearm silencer on or about his person while committing the offense; that he had caused the aggravated murder as part of a course of conduct with resulted in the death of two or more persons; and that he had committed aggravated murder while committing, attempting or immediately after committing the offense of aggravated burglary. The aggravated murder count as to Linda Myers (Count II) also included the same specifications except for the silencer specification. The aggravated burglary count (Count III) included firearm and silencer specifications.
 {¶ 2} A trial was held between April 21 and 27, 2004. Although the state sought the death penalty, the jury recommended and the court imposed a sentence of life imprisonment without parole eligibility on the aggravated murder counts. Myers was also sentenced to five years in prison on the aggravated burglary count and to a mandatory term of six years of incarceration for the silencer specification in Count I. The murder and burglary sentences were to be served concurrently with each other and consecutively to the mandatory specification sentence.
 {¶ 3} Myers raises ten assignments of error on appeal, which we will address in a manner that facilitates our analysis.
 {¶ 4} I. "APPELLANT'S JURY TRIAL RIGHTS UNDER THE UNITED STATES CONSTITUTION, SIXTH AMENDMENT AND OHIO CONSTITUTION, ARTICLE ONE, FIFTH AMENDMENT AND HIS RIGHT TO DUE PROCESS OF LAW WERE VIOLATED BY THE CUMULATIVE EFFECT OF THE FOLLOWING:
 {¶ 5} "(1) VENIREMEN TAINTED THE VENIRE DUE TO THEIR REPEATED AND EXTENSIVE, IMPROPER REMARKS, (2) BOTH THE COURT AND THE STATE INVOKED BIBLICAL AUTHORITY IN DISCUSSING LEGAL PRINCIPLES DURING VOIR DIRE, (3) THE COURT REPEATEDLY MISSTATED THE LAW IN PARAPHRASE IN A PREJUDICIAL MANNER, (4) THE PROSECUTOR REPEATEDLY MISSTATED THE LAW, AND (5) THE COURT DID NOT FOLLOW PROPER PROCEDURES IN THE QUESTIONING OF WITNESSES BY JURORS."
 {¶ 6} In his first assignment, Myers claims that there were several prejudicial errors during the jury selection process, and that the court did not follow correct procedures in allowing the jurors to question witnesses.
A. VOIR DIRE
 {¶ 7} Jury selection occurred over a two day period. The potential jurors from the first day did not attend the second day's session, which involved a new group of potential jurors. Although alternates were selected from the second day of voir dire, all of the jurors who deliberated and rendered a verdict were selected from the first day of voir dire. Thus, comments made on the second day of jury selection were not heard by any of the jurors who rendered a verdict in this case.
 {¶ 8} Myers first claims that the jury pool was tainted by the comments of two potential jurors, Mr. Harshbarger and Mr. Durst, who were questioned on the first day of voir dire. Mr. Harshbarger expressed his beliefs that some elements of an offense were more important than others and that a person could be found guilty if only four out of five elements of an offense were proven by the state, depending on what the missing element happened to be. Myers claims that Mr. Harshbarger's statements were especially damaging because he indicated that he had worked in law enforcement for thirteen years and was very pro-law enforcement.
 {¶ 9} Although Mr. Harshbarger's comments did not correctly reflect the state's burden of proof, the record reflects that the trial court took adequate corrective measures. After Mr. Harshbarger expressed his views, another potential juror indicated that she was confused by Mr. Harshbarger's comments. The court responded:
 {¶ 10} "Throughout the course of the trial, I'm formulating instructions. I know what the charges are. I've started working on them already. But I can't give the final instructions until all the evidence is in because you can't make your mind up about the law until you know what the evidence is. They go together as a marriage to the jury. You'll hear the evidence, I'll give you the law, then you go back and deliberate.
 {¶ 11} "Each of these offenses has elements or parts, if you will. Let's say there's five parts to the last count number three for aggravated burglary. There's five parts, okay. Whatever they are, just take my word for it, there's five parts.
 {¶ 12} "The State has to prove beyond a reasonable doubt each one of those five parts. If you're thoroughly convinced beyond a reasonable doubt of four out of five parts, the State's failed to prove the fifth part beyond a reasonable doubt so the verdict has to be not guilty because they failed to prove the fifth element.
 {¶ 13} "Mr. Harshbarger admitted if it was the identity of the Defendant that would be fatal. It doesn't matter if it's that element. If it's not all five beyond a reasonable doubt, it has to be not guilty as a verdict. * * *"
 {¶ 14} A few moments later, another potential juror asked the court if "four plus one, can that equal five?" The court responded that each element was a separate item, and that there "has to be separate proof of each of those elements." The court further explained that the state could prove those elements by either direct or circumstantial evidence.
 {¶ 15} In our view, the trial court adequately informed all of the potential jurors that each of the elements of an offense must be proven by the state beyond a reasonable doubt, and that Mr. Harshbarger's opinion was an incorrect view of the law. We note that the prosecutor likewise told the potential jurors that "the burden in a criminal case is upon the State of Ohio to prove every element. Not just four out of five * * * or two out of three but every element beyond a reasonable doubt." The jurors were again correctly instructed by the court prior to the presentation of evidence and in the final jury instructions. Significantly, Mr. Harshbarger was not selected as a juror. Reading the record as a whole, we find no prejudicial error in the court's treatment of Mr. Harshbarger's comments.
 {¶ 16} Myers further argues that the trial court erred in permitting Mr. Durst to relay his experience as a juror in a criminal case in New Jersey, during which Mr. Durst believed the defendant "was as guilty as they come" but voted not guilty because all of the other jurors believed that the defendant was not guilty. Mr. Durst expressed dismay at his prior experience, stating "I wasn't happy about it at all. But if you don't know when you're beat, you're getting pretty ignorant." Mr. Durst further explained that the experience did not comport with his "way of looking at things," saying that "when you can take a man charged with murder who pleads not guilty and he can get the death penalty and the other perpetrators of the crime plead guilty and you let them off with a sentence. Now, to me, that's not justice." Myers argues that the prospective jurors would likely have recognized the similarity between Mr. Durst's prior experience in a circumstantial murder case and Myers's case, and that they would have been influenced by Mr. Durst's story of a defendant who should have been found guilty but was acquitted due to his opinion that it was futile to oppose the other jurors.
 {¶ 17} Although the trial court did not explicitly address Mr. Durst's comments, the court and counsel repeatedly questioned the jury pool regarding their ability to assert their views during deliberations and stand by their opinions. Moreover, the court repeatedly informed the potential jurors that Myers was presumed innocent, and that the state bore the burden of proving his guilt beyond a reasonable doubt. Although the trial court might have done well to remind the potential jurors — immediately after Mr. Durst's comments — of the presumption of innocence, of the state's burden, and of the need for the jurors to act in accordance with their own opinions, Mr. Durst did not sit as a juror and we find no basis to conclude that Mr. Durst's comments resulted in any prejudice to Myers.
 {¶ 18} Second, Myers claims that the trial court erred by making Biblical references on two occasions during voir dire. On the first day of voir dire, a prospective juror indicated that she could vote her conscience and her convictions "because I think I'm a good Christian." The trial court responded by citing Matthew 7:1 and 7:2, which the court quoted as "Judge not lest you be judged" and "For so as you judge others, you yourself will be judged," respectively. The court summarized those scriptural passages, stating: "Those two verses together, in my opinion, mean that the obligation is to be a judge but not hypocritically, to follow the rules as if you were the person on trial." The court then asked the prospective juror if she could "sit here and do that without offending [her] religious beliefs." On the second day of jury selection with a new pool of prospective jurors, the court again referenced Matthew 7:1 and 7:2.
 {¶ 19} Although the court erred in interjecting specific religious references into the jury selection process, Myers has not demonstrated that he was prejudiced by the court's comments. Though the point could have been made without the biblical quotations, the court was merely questioning whether the potential juror would be able to judge Myers's guilt or innocence without violating her religious beliefs. The court did not suggest that the jurors should be guided by their religious beliefs rather than the law. Accordingly, we find no reversible error due to the court's comments. Moreover, because all of the jurors were selected from the first pool of prospective jurors, the court's comments on the second day to a different group of individuals clearly had no effect on the jury.
 {¶ 20} Third, Myers asserts that he was prejudiced by various misstatements of the law made during jury selection. He cites the following statements by the court on the first day of voir dire: (1) reasonable doubt is "something you would rely upon in your ordinary affairs every day;" (2) the jury tells "what the law means" under the particular set of facts; (3) "it's very unlikely for someone to be in a trial willy nilly;" (4) "[n]ot guilty means there's been a failure of proof by the State on all these elements;" (5) asking a venireperson who knew Detective Burns twenty-five years before whether Burns had "a good reputation with you then?" and (6) the court's description of parole eligibility. Myers cites two additional statements by the court on the second day of voir dire, which are inconsequential.
 {¶ 21} We agree with Myers that several of the court's statements — statements one, two, and four above — were misstatements of the law. However, the potential jurors were repeatedly instructed as to the proper law on these matters, including in the final jury instructions. We find nothing to suggest that Myers was prejudiced by these remarks. See State v.Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 137 (where jury is properly instructed by the court in the final jury instructions, prosecutor's misstatements during voir dire would not have affected outcome of trial).
 {¶ 22} As to the court's implication that Myers would not be in a trial "willy nilly," the court was responding to the following question by a prospective juror regarding the presumption of innocence: "* * * [D]on't you have to have something that made you choose that person [the defendant;] otherwise you could go around arresting innocent people all the time and you would get sued. I guess I need more clarification on that." The court responded that "before anybody makes it this far, there are legal requirements of some evidence and a review by a judge or a grand jury." Thus, while the court indicated that an individual would not be in a trial "willy nilly," it further informed the jury pool that there had not yet been a trial and that the review by the grand jury or the judge in a preliminary hearing involved different standards of proof. Although the court could have responded more artfully, there is no indication that the court's comment undermined its repeated instruction that Myers was presumed innocent and that the state had to prove its case beyond a reasonable doubt.
 {¶ 23} Likewise, we find no prejudice due to the court's question regarding Detective Burns. When asking the potential juror regarding Detective Burns, the court emphasized that it wanted "to make sure you don't bring in relationships that affect the verdict. You still have to scrutinize his testimony." Upon hearing that Burns had a good reputation, the court inquired whether the potential juror was still willing to scrutinize his testimony. Reading the exchange in context, we find no suggestion that the jury pool would have been tainted by the court's question.
 {¶ 24} As to the court's statements regarding parole eligibility, the court was responding to a question as to whether there were criteria that have to be met to recommend a life sentence with parole eligibility. From the record, it is apparent that the court misunderstood the question when it discussed that a parole board determines whether an offender receives parole and that a sentence with parole eligibility was not a recommendation. After a follow-up question, the court acknowledged that it had misunderstood the question and "[t]old too much the first time probably." Although the court's discussion of parole eligibility at that time may have been superfluous, we find nothing in the court's response that suggested a particular sentence for Myers. Reading the record as whole, we find no basis to conclude that the court's response during voir dire had influenced the juror's preference among the sentencing options.
 {¶ 25} Fourth, Myers contends that the prosecutor made several misstatements of the law during voir dire, particular as to the burden of proof required of the state. Myers complains, for example, that the prosecutor referred to reasonable doubt as a "fifty-pound weight against three ounces." Reading the entire voir dire, the state repeatedly characterized its burden of proof as a very heavy one. In fact, at times, the state appears to have overstated — rather than understated — the extent of its burden. Moreover, as stated above, the jurors were apprised of the correct law several times during voir dire, prior to opening statements and during the final jury instructions. We do not find the statements to which Myers refers to have been prejudicial.
 {¶ 26} In sum, upon review of the record in its entirety, we conclude that, although some errors occurred during voir dire, these errors — both individually and cumulatively — did not constitute prejudicial error.
B. QUESTIONING OF WITNESSES BY THE JURY
 {¶ 27} Myers claims that his right to due process was violated by the manner in which the jurors were permitted to question witnesses.
 {¶ 28} In State v. Fisher, 99 Ohio St.3d 127,2003-Ohio-2761, 789 N.E.2d 222, the Supreme Court of Ohio recognized that allowing jurors to question witnesses is a permissible practice left to the discretion of the trial court. The supreme court expressed that, "in order to minimize the danger of prejudice, however, trial courts that permit juror questioning should (1) require jurors to submit their questions to the court in writing, (2) ensure that jurors do not display or discuss a question with other jurors until the court reads the question to the witness, (3) provide counsel an opportunity to object to each question at sidebar or outside the presence of the jury, (4) instruct jurors that they should not draw adverse inferences from the court's refusal to allow certain questions, and (5) allow counsel to ask followup questions of the witnesses." Id. at ¶ 29 (footnote omitted).
 {¶ 29} On appeal, Myers asserts that the court did not followFisher's procedures for the questioning of witnesses by the jury, specifically the requirement that the court instruct the jury that they should not draw adverse inferences from the court's refusal to ask certain questions. As noted by the state, the court instructed the jury prior to the presentation of evidence, as follows:
 {¶ 30} "[T]here's another tool that I'm going to use which is to allow you to propose or submit to me a question that you might want the witness to answer. I don't know, nor will I promise you that that question will go to the witness.
 {¶ 31} "The Ohio Supreme Court has said that this is permissible. They have asked that it be used with caution. In the last year since I worked with the study to do this and kind of talked to other judges and jurors, I found people say positive things about the ability to submit questions but I don't want you to think that because you're submitting a question I owe you any obligation to ask the question because I don't know a lot of times if it's permissible so I'm going to have the lawyers come up here and pow wow. And then if it's a question that's appropriate, I'll ask. It might be in a slightly different wording or format and [I'll] try to get you the information that you thought was necessary to be an effective juror.
 {¶ 32} "So when a witness is finished, the Bailiff will hand you a piece of paper like this. Take the piece of paper. If you want to write a question, you can. Don't sign it. At the right time, we'll just have you pass them all down. Fold them over, pass them in. Randomly, without any identification of the juror, I'll look at the question with the lawyers and decide whether or not the question is necessary.
 {¶ 33} "In the past, my experiences have been some questions are perfectly appropriate, others were obviously not. Some involve matters that really don't affect the case but were curiosity for the juror that were necessary for their help so why not and they're all over the place.
 {¶ 34} "So I'm going to try this with confidence that it will be done right with the hope you have another tool to make the decision. Just understand that I don't mean anything if I don't ask your particular question. There's probably a perfectly good reason not to do that."
 {¶ 35} In our judgment, the trial court's instructions were sufficient to apprise the jurors that the court might not ask all of the questions that they had submitted and that, if a question were not asked, the court had a good reason for not doing so. Although the court did not use the exact words that the jury "should not draw adverse inferences from the court's refusal to allow certain questions," that message was sufficiently conveyed.
 {¶ 36} Myers also complains that the court failed to employ its procedure consistently. In particular, he notes that the state's first witness, Melanie Harris, was permitted to leave without the jury being afforded an opportunity to question her. Considering that the jury was given an opportunity to question every other witness, the court's failure to allow the jury to present questions to Ms. Harris was clearly an oversight. Although we agree that all witnesses should have been treated similarly, we find any error in this regard was harmless. Myers was provided an ample opportunity to cross-examine Harris, and defense counsel presumably asked all of the questions that they considered relevant.
 {¶ 37} Finally, Myers argues that he was unfairly surprised by the court's indication on the third day of trial (prior to opening statements) that it would permit jurors to submit questions for the witnesses. Whether to permit jurors to question witnesses is a matter within the court's discretion. Fisher,99 Ohio St.3d at 135. Moreover, Evid.R. 611(A) grants the trial court discretion to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to * * * make the interrogation and presentation effective for the ascertainment of the truth." We find no abuse of discretion by the court.
 {¶ 38} The first assignment of error is overruled.
 {¶ 39} II. "THE COURT ERRED IN FAILING TO DISMISS COUNT III OF THE INDICTMENT OR TO REQUIRE THE PROSECUTOR TO MAKE AN ELECTION SINCE COUNT III IS DUPLICITOUS."
 {¶ 40} III. "THE COURT ERRED IN FAILING TO DISMISS COUNT III OF THE INDICTMENT SINCE IT INCLUDED AN UNCHARGED CRIME."
 {¶ 41} In his second and third assignments of error, Myers claims that Count III of the indictment, aggravated burglary, did not adequately specify the offense for which he was charged.
 {¶ 42} Count III of the indictment charged that on March 27, 2003, Myers
 {¶ 43} "by force, stealth, or deception, did trespass in an occupied structure, to wit: the home of Jack and Linda Myers, located at 7632 Martin Road, in Adams Township, Darke County, Ohio, when another person other than an accomplice of the offender is present, to wit: the said Jack and Linda Myers, with purpose to commit in the structure any criminal offense, and said GREGG A. MYERS inflicted physical harm on said Jack and Linda Myers; or said GREGG A. MYERS had a deadly weapon or dangerous ordnance on or about his person or under the offender's control[.]"
 {¶ 44} In these assignments of error, Myers argues that Count III is duplicitous because it charged two separate offenses — R.C. 2911.11(A)(1) and R.C. 2911.11(A)(2) — in one count. He asserts that Count III should have been dismissed due to this duplicity or, alternatively, that the state should have been required to elect which offense it intended to present to the jury. Myers further claims that the trial court should have dismissed Count III because it included an uncharged crime.
 {¶ 45} As an initial matter, defects to an indictment, such as duplicity and vagueness, must be raised prior to trial or the issue is waived. Crim.R. 12(C)(2); see, also, R.C. 2941.29. Myers moved to dismiss Count III due to duplicity on April 26, 2004. Because Myers failed to raise the issue prior to trial, he has waived his challenge of the indictment.
 {¶ 46} Even if Myers's challenge had been timely, the court overruled Myers's motion to dismiss Count III but granted his request to require the state to elect between R.C. 2911.11(A)(1) and R.C. 2911.11(A)(2). The state chose to proceed under R.C.2911.11(A)(1), and the state's closing argument and the jury instructions reflected R.C. 2911.11(A)(1) only. This ruling was journalized on April 28, 2004. The court thus provided Myers the remedy that he had requested for the alleged duplicity.
 {¶ 47} Myers's argument that Count III was defective because it did not specify the underlying felony is also without merit. The supreme court has held that an indictment is sufficient if it tracks the wording of the applicable statutes, especially when a bill of particulars may be used to obtain additional information.State v. Murphy (1992), 65 Ohio St.3d 554, 583, 605 N.E.2d 884; see State v. Skatzes, Montgomery App. No. 15848, 2003-Ohio-516, ¶ 56. On February 11, 2004, the state filed a bill of particulars, specifying that Myers "did purposely, and with prior calculation and design, cause the death of Jack L. Myers and Linda C. Myers" and that Myers had trespassed in the home of Jack and Linda Myers when they were present "with purpose to commit said unlawful killings." Thus, Myers was fully aware, prior to trial, of the charges against him.
 {¶ 48} The second and third assignments of error are overruled. .
 {¶ 49} IV. "THE COURT ERRED IN FAILING TO DISMISS THE SILENCER SPECIFICATIONS TO COUNTS I, II AND III."
 {¶ 50} In his fourth assignment of error, Myers asserts that the silencer specifications must be dismissed as unconstitutionally vague and because there was no evidence of the silencer's operability.
 {¶ 51} R.C. 2929.14(D)(1)(a) requires a trial court to impose a six-year mandatory prison term if the offender is convicted of having "a firearm * * * that was equipped with a firearm muffler or silencer on or about the offender's person or under the offender's control while committing the offense." "Firearm muffler or silencer" is not defined in the Ohio Revised Code.
 {¶ 52} "To withstand a claim of vagueness, a criminal statute must define a criminal offense with sufficient clarity for ordinary people to understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." State v. McKnight, 107 Ohio St.3d 101, 134,2005-Ohio-6046, 837 N.E.2d 315. The state asserts that both "muffler" and "silencer" have commonly understood meanings in the context of R.C. 2929.14(D)(1)(a), i.e., "a device for muffling the noise of a gunshot." Merriam-Webster Desk Dictionary (1995). Although it might be prudent for the legislature to provide a definition in the Revised Code, we agree with the state that the definition of a firearm silencer is commonly understood. Accordingly, the silencer specification in R.C. 2929.14(D)(1)(a) is not unconstitutionally vague.
 {¶ 53} Myers also claims that the specification should have been dismissed because the state failed to offer evidence that the alleged silencer was operable. Myers argued — and the trial court agreed — that the state was required to demonstrate that the alleged silencer was operable, in accordance with State v.Genavesi (Nov. 20, 1984), Franklin App. No. 84AP-74. In that case, the defendant asserted that the state had failed to prove that he was guilty of possessing a dangerous ordnance, in violation of R.C. 2923.17, when the laboratory report stated that the silencer at issue "did not significantly reduce the noise" of the submachine gun. A "dangerous ordnance" includes "[a]ny firearm muffler or silencer." R.C. 2923.11(K)(5). The Genavesi
court concluded that "[i]mplicit in the definitional sections is the requirement that the dangerous ordnance be operable" and, thus, a silencer must be operable to constitute a dangerous ordnance under R.C. 2923.17. The court found, however, that the laboratory's report did not require a conclusion that the silencer was inoperable, only that it did not function well.
 {¶ 54} Here, the state presented evidence that Myers had purchased batting and masking tape from Wal-Mart on March 26, 2003, and that the batting had been wrapped around the barrel of the shotgun and secured with the tape. Detective Sergeant Mark Whittaker testified that "seeing the tape on the end [of the batting] and what appeared to be black residue coming out of it and the way it was rolled up," he and the other detectives suspected that the batting had been used as a silencer. Timothy Duerr, a forensic scientist at the Miami Valley Regional Crime Lab ("MVRCL"), testified that the batting had been rolled up and that he could see where it was melted due to contact with the heat of the barrel of the firearm. Duerr indicated that the batting was "consistent with being used as some type of muzzling device to try to keep down sound." Duerr further stated that the testing he did on the batting was consistent with a gunshot passing through it. These witnesses also testified that the batting had separated from the shotgun when it was first fired at Jack Myers, and that the batting was found on him at the head of the bed.
 {¶ 55} In our judgment, the evidence does not require a conclusion that the silencer was inoperable. The state's evidence clearly supports the conclusion that Myers had taped the batting to the shotgun for the purpose of muffling the sound of the shots. Duerr's testimony indicates that the batting remained on the barrel long enough to melt due to contact with the heated barrel and that a gunshot had passed through it. Although there is no explicit evidence that the batting functioned well as a silencer, the jury could have reasonably concluded that the batting was operable as a silencer — to some extent — when Jack Myers was shot.
 {¶ 56} The fourth assignment of error is overruled.
 {¶ 57} V. "THE COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS STATEMENTS."
 {¶ 58} In his fifth assignment of error, Myers claims that the trial court erred in failing to suppress his statements to law enforcement officers. He argues that his statements were made involuntarily and without an effective waiver of his Miranda
rights.
 {¶ 59} Myers was interviewed by officers of the Darke County Sheriff's Department on two occasions: March 27, 2003, and March 29, 2003. The suppression hearing and this assignment of error focus on the March 29 interview, which lasted for approximately 3½ hours. Myers was arrested at the conclusion of the March 29 interview.
 {¶ 60} During the suppression hearing, the trial court was presented with testimony from Detective Sergeant Whittaker and Detective Burns as well as the videotape and a transcript of the March 29 interview. According to the evidence, Myers was interviewed at the Darke County Criminal Justice Center beginning at approximately 6:39 p.m. The interview occurred in a five foot by five foot interrogation room and was primarily conducted by Detective Burns and Sergeant Shawn Trissel, both of whom had interviewed Myers on March 27. Whittaker, who watched most of the interrogation from the detectives' office via closed-circuit television, participated in the interrogation during approximately the last twenty minutes. The prosecuting attorney, who had later joined in the viewing, also participated with Whittaker, Burns and Trissel.
 {¶ 61} A few minutes into the interview, Burns read a statement of Myers's Miranda rights to him and asked him to follow along. Burns also asked Myers to summarize each right in his own words. After reviewing his rights, Myers signed a Waiver of Rights form. Burns explained that waiver of rights "doesn't mean that you given them all up." He further told Myers that they could take breaks, such as to use the bathroom or to get a drink.
 {¶ 62} Much of the interview involved questions concerning Myers's immediate family; his father's wives; his father's sources of income; Myers's activities on March 26 and 27, 2003; his relationship with his father; and Myers's financial situation. As the interview focused on Myer's financial situation and his father's will, the questioning became more accusatory and Burns and Trissel began to question Myers together, rather than one officer being the primary interrogator. In response to the officers' accusations, Myers stated that he wanted "legal advice." Myers repeated this phrase numerous times when confronted with accusations and when offered a plea agreement in exchange for an admission of criminal conduct. In response to Myers's statements that he wanted legal advice, Whittaker joined the interrogation in an attempt to clarify whether Myers was asking for an attorney. Whittaker also expressed that the prosecutor was willing not to seek the death penalty if Myers provided a "truthful statement." Whittaker indicated that the offer might not be available after the interview had concluded. When Myers did not expressly state that he wanted an attorney, the prosecuting attorney also joined in the interview to clarify whether Myers wanted counsel. Although Myers did not respond that he wanted an attorney, he repeatedly stated that he wanted "legal advice" but also did not want the death penalty. The interview concluded at 10:17 p.m., when Myers expressly stated that he wanted an attorney.
 {¶ 63} On appeal, Myers states that he was interrogated in a small room, was subjected to a prolonged period of interrogation during which the officers "relieve[d] each other periodically in order to keep the questioning going," was subjected to "tactical misstatements" and "Mutt-Jeff" role-playing by the officers, was frequently interrupted when he attempted to answer questions, was promised a life sentence if he cooperated immediately, and was warned about a "small window of opportunity." Myers also objects to the participation of the prosecutor. Myers emphasizes that his repeated requests for an attorney were ignored.
 {¶ 64} "Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues." State v. Eley (1996), 77 Ohio St.3d 174, 178,672 N.E.2d 640; State v. Kelly, Greene App. No. 2004-CA-20,2005-Ohio-305.
 {¶ 65} In order for a defendant's statements made during a custodial interrogation to be admissible, the prosecution must establish that the accused knowingly, voluntarily, and intelligently waived his Fifth Amendment right against self-incrimination. State v. Edwards (1976), 49 Ohio St.2d 31,38, 358 N.E.2d 1051, overruled on other grounds, (1978),438 U.S. 911, 98 S.Ct. 4137, 57 L.Ed.2d 1155; Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. When a suspect waives his right to counsel after Miranda warnings have been given, law enforcement officers are free to question him. However, once a suspect requests counsel, the police must cease their interrogation until an attorney has been provided or the suspect himself reinitiates conversation. Edwards v. Arizona
(1981), 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378;United States v. Davis (1994), 512 U.S 452, 458,114 S. Ct. 2350, 129 L.Ed.2d 362.
 {¶ 66} Whether a suspect has invoked his right to counsel is an objective inquiry. Id. A request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel. Davis, 512 U.S. at 459; see State v.Murphy, 91 Ohio St.3d 516, 520, 2000-Ohio-112, 747 N.E.2d 765. The Supreme Court of Ohio has held that the statement "I think I need a lawyer" was not an unequivocal assertion of the right to counsel. State v. Henness (1997), 79 Ohio St.3d 53, 63,679 N.E.2d 686. "Don't I supposed to have a lawyer present" has also been found to be ambiguous. State v. Brown, 100 Ohio St.3d 51,56, 2003-Ohio-5059, 796 N.E.2d 506. "If a suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis,512 U.S. at 461-62; Brown, 100 Ohio St.3d at 56,796 N.E.2d 506. Moreover, the officers have no obligation to ask clarifying questions to ascertain if the suspect is attempting to invoke his right to counsel. Davis, supra.
 {¶ 67} Even when Miranda warnings are not required, a defendant's statement may be involuntary and subject to exclusion. Kelly at ¶ 11. "The test for voluntariness under aFifth Amendment analysis is whether or not the accused's statement was the product of police overreaching." State v.Finley (June 19, 1998), Clark App. No. 96-CA-30; State v.Dailey (1990), 53 Ohio St.3d 88, 92, 559 N.E.2d 459, citingMoran v. Burbine (1986), 475 U.S. 412, 421, 106 S.Ct. 1135,89 L.Ed.2d 410. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."Edwards, 49 Ohio St.3d at paragraph two of the syllabus; seeState v. Brewer (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491;State v. Marks, Montgomery App. No. 19629, 2003-Ohio-4205.
 {¶ 68} Whether a statement was voluntarily given is a question of law, which we review de novo. Arizona v. Fulminante
(1991), 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302;State v. Booher (1988), 54 Ohio App.3d 1, 7, 560 N.E.2d 786. "However, weighing the evidence and determining witness credibility at suppression hearings are matters within the sound discretion of the trial court." State v. Sutphin (June 30, 1999), Greene App. No. 98CA140.
 {¶ 69} In ruling on Myers's motion to suppress, the trial court granted it in part and denied it in part. The court agreed with Myers that his request for "legal advice" was the functional equivalent of a request for an attorney and that he had invoked his right to counsel. The court accordingly suppressed Myers's statements after the initial point at which Myers requested legal advice (page 83, line 2402 of the transcript of the interrogation) and stated that "the State of Ohio cannot use them as direct evidence at trial herein." Reviewing whether the circumstances of the interview were coercive, the trial court concluded that the duration and location of the interview were not coercive, that there was no evidence that Myers was affected by the officers' "good guy-bad guy" technique, and that his personal characteristics were not a basis to suppress his statements. The court further found that the officers' overstatements of the strength and quality of the evidence against him were "not so outrageous or burdensome so as to result in any coercive influence upon [Myers]." The court found, however, that the officers' use of the death penalty in an attempt to obtain a prompt confession was unduly coercive. The court thus suppressed as involuntary Myers's statements made after Whittaker entered the room (page 85, line 2478 of the interview transcript). The court found that "the totality of the circumstances lead to the conclusion that the Defendant's statement was voluntarily made, except for those portions of the transcript after page 83, line 2402, which are suppressed."
 {¶ 70} Beginning with Myers's complaint that his requests for counsel were ignored, the record reflects that the trial court suppressed the portion of Myers's statements that were made after his initial request for "legal advice" on the ground that Myers's right to counsel had been violated. Accordingly, it is clear that the court redressed Myers's complaint that his request for counsel had not been honored by the officers. Moreover, the prosecutor stipulated at the suppression hearing that the state would not use any of Myers's statements after he asked for legal advice.
 {¶ 71} As for Myers's assertion that all of his statements should be suppressed due to the coercive nature of the interview, we find no fault with the trial courts ruling. The record reflects that Myers was twenty-five years old and had graduated from high school. Myers denied being under the influence of drugs or alcohol during the questioning. There is no evidence of physical deprivation or that the environment was coercive. Moreover, as found by the trial court, there is little evidence that the interrogation techniques that were used by the detectives overbore Myers's will and critically impaired his capacity for self-determination. Thus, the trial court did not err in failing to suppress the portion of the interview prior to the point at which the court concluded that Myers was subjected to coercive conduct.
 {¶ 72} The fifth assignment of error is overruled.
 {¶ 73} VI. "THE COURT ERRED IN PERMITTING THE STATE TO USE DEFENDANT'S INVOLUNTARY STATEMENTS FOR IMPEACHMENT PURPOSES."
 {¶ 74} In his sixth assignment of error, Myers claims that the trial court improperly permitted the state to use his involuntary statements for impeachment purposes if he chose to testify. Myers asserts that this ruling "unconstitutionally chilled" his ability to testify in his own defense.
 {¶ 75} Whether the statements of a defendant may be used for cross-examination depends upon the reason for the suppression of those statements. The Supreme Court of Ohio has recognized that "an accused's voluntary statement could be used to impeach even when the statement was taken in violation of the right to have counsel present." State v. Hill (1996), 75 Ohio St.3d 195, 207,661 N.E.2d 1068; State v. Conway, 108 Ohio St.3d 214, 230-31,2006-Ohio-791, 842 N.E.2d 996; see Harris v. New York (1971),401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. However, the "use at trial of an involuntary statement is a denial of due process and reversible error." State v. Jenkins (1984), 15 Ohio St.3d 164,231, 473 N.E.2d 264, citing Mincey v. Arizona (1978),437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290.
 {¶ 76} On April 16, 2004, Myers filed a motion to suppress the use of his statements for impeachment purposes, arguing that the court's ruling on his motion to suppress indicated only that the state could not use his statements as direct evidence at trial. On April 21, 2004, the court described on the record some issues that had been discussed in chambers the previous day. Concerning the March 29 statement, the court noted that the statement had previously been the subject of a motion to suppress, that the prosecutor had agreed not to use the end of the interview and that the court had suppressed that portion of the interview "and some more." The court then addressed a motion in limine regarding the portion of the tape that had not been suppressed. The court concluded that the use of the tape of the interview and the transcript of the tape would not be permitted at trial. Citing the hearsay rule, the court nevertheless concluded that the individuals involved in the interview could discuss Myers's statements in the unsuppressed portion of the March 29 interview. On April 27, 2004, the court reiterated its ruling that testimony that the initial portion of the March 29 interview was admissible but that there was a point subsequent to which the state had agreed not use Myers's statements and the court had suppressed that portion. The court also repeated that the tape and the transcript of the interview could not be used.
 {¶ 77} On April 28, 2004, the court journalized its oral rulings, stating: "While the Defendant would have benefitted from this request since his testimony would not have been subject to impeachment by the contents of the March 29, 2003 statement, this basis is insufficient to grant the request." The court cited to Evid.R. 801(D)(1).
 {¶ 78} In our view, the trial court's suppression ruling indicated that the portions of the March 29 statement that were obtained in violation of Myers's right to counsel could not be used by the state as direct evidence. In contrast, in ruling that a portion of his statement was also involuntary, the court suppressed that portion without qualification. (As noted by the trial court, those portions are substantially the same.) Thus, the court's suppression ruling does not indicate that the involuntary portion could be used for impeachment. Although the court's April 28 entry is not as precisely drafted as it could have been, read in the context of the oral pronouncements, it is apparent that the suppressed portion could not be used by the state but that the statements made earlier during the March 29 interview were admissible through witness testimony.
 {¶ 79} Even assuming that the court had indicated that the involuntary portion of Myers's statement could be used for impeachment if Myers chose to testify, we would find no reversible error on the record before us. Myers did not testify and, thus, none of the statements in question were used against him at trial. Moreover, upon review of the portion of the interview that the trial court deemed involuntary, we find nothing in that portion that would have reasonably "chilled" his ability to testify in his own defense. After Whittaker entered the room, Myers did not confess or say anything incriminating. Myers merely indicated that he understood what the detectives were telling him, that he wanted legal advice before continuing the interview, and that he did not want the death penalty.
 {¶ 80} The sixth assignment of error is overruled.
 {¶ 81} VII. "APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 82} VIII. "APPELLANT'S CONVICTION FOR AGGRAVATED BURGLARY IS NOT SUPPORTED BY * * * SUFFICIENT EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 83} In his seventh and eighth assignments of error, Myers argues that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.
 {¶ 84} "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed. 1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis,79 Ohio St.3d 421, 430, 1997-Ohio-372, 683 N.E.2d 1096, citingJackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 85} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387, citing State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 86} According to the state's evidence, between 3:00 a.m. and 9:00 a.m. on March 27, 2003, Jack and Linda Myers were killed while sleeping in their first-floor bedroom at their home, located at 7632 Martin Road in Darke County, Ohio. Jack died of perforating shotgun wounds to the head and neck; Linda died of perforating shotgun wounds to her head with extensive damage to her face. At approximately 9:15 a.m., Damian Huffman, Linda's great-grandson who lived with Jack and her, arrived at his school at the Oakland Church of the Brethren, which was approximately one mile from the Myers residence, wearing his pajamas and boots. Damian reported that his "parents were melting" and asked for help. Melanie Harris, a family service worker with Gettysburg Head Start, called 911. Detective Sergeant Mark Whittaker, Deputy John Green, Detective Michael Burns, and Detective Rodney Baker of the Darke County Sheriff's Department responded to the scene and began an investigation.
 {¶ 87} On March 28, 2003, the day after the homicides, Jon Helmandollar, a friend and former neighbor of Myers, contacted the Sheriff's Department. At trial, Helmandollar testified that he had received a telephone call from Myers a couple of days prior to the shootings. During their conversation, Myers had asked Helmandollar if he (Helmandollar) knew where he (Myers) could get a gun. Myers later indicated that he was going to shoot his father. Helmandollar further testified that Myers had once told him that he was going to inherit his father's farm.
 {¶ 88} The state presented substantial circumstantial evidence that Myers had obtained the weapon that was involved in the deaths of Linda and Jack. Eugene Adams testified that he had placed an advertisement in Trading Post to sell a Winchester 12-gauge pump shotgun, "like new," for $175. Myers stipulated that Myers purchased a shotgun from Adams on March 25, 2003. The box for the shotgun, which Adams had kept, indicated that it was a Winchester, Model 1300, pump action, 12-gauge shotgun Ranger Field, with the serial number L3061845. Dwight Edwards of the Ohio Department of Natural Resources, Wildlife Division, who was assisting the Darke County Sheriff's Department, testified that on April 1, 2003, he located a shotgun in the Stillwater River where it crosses State Route 185 in Miami County. The shotgun was a Winchester, Model 1300, 12-gauge shotgun with its serial number scratched off and with tape wrapped around the barrel. Timothy Duerr testified that he was able to restore a portion of the serial number: L3__1_45. He further testified that possible numbers for the third digit were 8, 6, 0, or 9; for the fourth digit were 0, 8, 6, or 3; and for the sixth digit were 3, 2, 8, 9. Thus, the portions of the serial number that were raised matched those of the gun sold to Myers by Adams, and the possible numbers for the missing digits were also consistent with the shotgun sold to Myers. Detective Burns testified that he had spoken with Myers on March 27, 2003. Although Myers indicated to Burns that he owned several guns, he did not mention having purchased a shotgun recently.
 {¶ 89} Numerous pieces of evidence were recovered from the scene. Wadding and pieces of red plastic that came from within the shot shell of a Federal 12-gauge shotgun sabot slug were found around the bed and in the headboard at the scene. Batting with masking tape was located on Jack. The officers took photographs of tire impressions that were located on the driveway and castings of shoe impressions that were found around the house, including near a basement window that had been removed. Additional shoe impressions were found in the basement.
 {¶ 90} On April 2, 2003, officers conducted additional searches for evidence along the Stillwater River. Sergeant Trissel, who was searching in an Ohio State Highway Patrol helicopter, spotted a black trash bag approximately one-half mile downstream from where the shotgun had been found. The bag contained, among other things, a pair of green athletic pants and a matching pullover jacket; a pair of black stockings; a pair of Route 66 tennis shoes; two spent 12-gauge shotgun shells, a box of Federal 12-gauge sabot slugs, a plastic bag; ten latex gloves; a roll of masking tape; a roll of duct tape; a box of nine millimeter handgun ammunition; and a concrete block.
 {¶ 91} Duerr testified that the wadding and pieces of sabots recovered at the scene were consistent with coming from Federal sabot slugs. Detective Baker and Noffsinger testified that the shoe patterns on the Route 66 shoes were consistent with the shoe impressions found at Jack and Linda's residence. Susanne Noffsinger, a trace evidence examiner with MVRCL, testified that the size and tread of the tires on Myers's minivan were consistent with the tire impressions found at Jack and Linda's residence. She also testified that the pieces of masking tape collected from the batting at the scene, from the barrel of the gun found in the river, and from the roll of tape in the bag fit together. Ronald Huston, supervisor of the fingerprint/AFIS section of MVRCL, testified that a latent fingerprint on the right index finger of one of the latex gloves belonged to Myers.
 {¶ 92} The state presented substantial evidence that the items found in the Stillwater River had been purchased by Myers. Detective Baker testified that he wrote down all of the UPC codes from the items found in the trash bag and attempted to match them with purchases from a K-Mart store in Piqua and a Wal-Mart store in Sidney. Baker met with Steve Lewinski, manager of the K-Mart store in Piqua, and learned that duct tape, Glad 30-gallon trash bags, latex gloves, conditioner, shoes, men's pants, men's jacket, size 7½ shoes were purchased on March 20, 2003, as part of one transaction. Jennifer Brown, Myers's girlfriend when the homicides occurred, testified that Myers had once called her to check if she needed anything from K-Mart, which was unusual as Myers normally shopped at Wal-Mart. When Brown was reminded that she had received a call from Myers at approximately 5:01 p.m. on March 20, 2003, she stated that that would have been "about the right time."
 {¶ 93} Detective Baker testified that he also met with Dean Daugherty, assistant manager of the third shift at Wal-Mart, and Sandra McRoberts, a loss prevention employee at Wal-Mart. Baker and Daughtery testified that one box of Federal sabot slugs was purchased at 5:22 p.m. on March 25, 2003. The lot number of the box of slugs found in the river was the same as the lot number of the slugs purchased from Wal-Mart. Baker and McRoberts testified the purchase was made using a gift card. Baker testified that the card matched a Wal-Mart gift card that was in Myers's wallet at the time of his arrest. In addition, McRoberts located surveillance videos of Myers purchasing the items on March 25 and of him purchasing batting and masking tape on March 26.
 {¶ 94} The state further presented evidence that Myers could have committed the offenses during the times at issue. Detective Burns testified that Myers had indicated on March 27, 2003, that he had left his home around 4:30 a.m., had gotten to work at NK Parts in Sidney at 5:15 a.m., and had clocked in at 5:23 a.m. Jennifer Brown testified that she had awakened at 4:36 a.m. on March 27, 2003, and that Myers had already left. Brown stated that she thought it was early for Myers to have left and that she had tried to call him on his cell phone but was unsuccessful. Detective Whittaker testified that he drove the routes that he suspected Myers to have taken from Jack and Linda's residence to NK Parts, from NK Parts to Myers's home, and from Myers's home to Jack and Linda's residence. Whittaker indicated that the trip from Jack and Linda's home to Myers's employer took 33 minutes, that the trip from NK Parts to Myers's home took 20 minutes, and that the trip from Myers's home to Jack and Linda's residence took 24 minutes. Finally, Sheila Brown, a neighbor of Jack who lives on Martin Road, testified that she saw a "van type vehicle," like a minivan, "coming out the lane" from Jack and Linda's residence at approximately 4:40 a.m. on March 27, 2003, when she was driving to work. Brown stated that she thought it was "weird" to see the van, because she had never seen a vehicle coming from that house at that time before. Brown indicated that van's lights were on and that she could not discern the color of the van or any of its features. Several witnesses testified that Myers drove a tan minivan.
 {¶ 95} Finally, Detective Whittaker testified that he had located a copy of Jack's will, of which Myers was a beneficiary, and that Linda was the beneficiary of Jack's annuity with Myers being the contingent beneficiary. The state provided evidence that Myers's home had recently been foreclosed upon and that he had been evicted from the residence.
 {¶ 96} On appeal, Myers asserts that, although there is evidence linking him to some items found in the river, there is no evidence that places him at Linda and Jack's home on the morning of March 27, 2003, nor is there evidence that he was the shooter. Myers emphasizes that there was no trace evidence linking him to the crime, and that a hair that was found in the garbage bag in the Stillwater River was found not to match Myers's hair. He argues that, "[a]t best, he was proven to be a complicitor" but he was charged only as a principal.
 {¶ 97} Upon review of the record, we cannot conclude that the jury clearly lost its way when it convicted Myers of aggravated murder and aggravated burglary. The state presented a substantial amount of circumstantial evidence that Myers had obtained the shotgun, masking tape, batting, and ammunition used in the shooting of his father and step-mother. Although Noffsinger could not state that the tire impressions came from Myers's van, the jury could have reasonably concluded — considering the totality of the evidence — that the van that was seen by Sheila Brown leaving Jack and Linda's residence belonged to Myers. Although Myers's girlfriend testified that his van had a loud muffler, the jury also could have reasonably believed Sheila Brown's testimony that she could not hear a loud muffler because she had her windows up and her radio on. Moreover, there was ample evidence that Myers had left his residence earlier than usual and that he could have committed the shootings, left Jack and Linda's residence at 4:45 a.m., discarded the shotgun and other items in the Stillwater River, and clocked into work at 5:23 a.m. as he had indicated. Although there was no explicit evidence placing Myers within his father's home, the jury could have reasonably inferred, when considering the evidence as a whole, that Myers had entered the residence through the window with the purpose of shooting his father and step-mother and that he killed both of them. In sum, we find that the state provided a solid circumstantial case that Myers had committed the aggravated murders and the aggravated burglary, and the jury did not lose its way in convicting him of these offenses. Because the jury's verdicts were not against the manifest weight of the evidence, they clearly were based on sufficient evidence.
 {¶ 98} The seventh and eighth assignments of error are overruled.
 {¶ 99} IX. "APPELLANT WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS WHERE THE STATE DID NOT PROVIDE THE DEFENSE WITH THE NAMES OF SUSPECTS AND IMPEACHMENT INFORMATION RELATING TO OTHER SUSPECTS PRIOR TO TRIAL, IN COMPLIANCE WITH NUMEROUS COURT ORDERS FOLLOWING NUMEROUS SPECIFIC DEFENSE REQUESTS."
 {¶ 100} In his ninth assignment of error, Myers claims that he was not provided with the names of other suspects, contrary toBrady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215, and Kyles v. Whitley (1995), 514 U.S. 419,115 S.Ct. 1555., 131 L.Ed.2d 490. In addition, Myers asserts that the state did not provide him with impeachment information regarding Jon Helmandollar, a key prosecution witness.
 {¶ 101} The prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady,373 U.S. at 87. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, `if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles, 514 U.S. at 433-434, citing United Statesv. Bagley (1985), 473 U.S. 667, 682, 105 S.Ct. 3375,87 L.Ed.2d 481. A "reasonable probability" of a different result is demonstrated when the government's suppression of evidence "undermines the confidence in the outcome of the trial." Id. at 434.
 {¶ 102} However, "the State is not obligated to provide a defendant with information that he could obtain on his own."State v. Thornton, Montgomery App. No. 20652, 2005-Ohio-3744, ¶ 21, citing State v. Franklin (May 17, 2002), Montgomery App. No. 19041, 2002-Ohio-2370." Moreover, a prosecutor is not required to have an open file policy. Kyles, supra; State v.Sanders, 92 Ohio St.3d 245, 261, 2001-Ohio-189, 750 N.E.2d 90. In addition, no constitutional violation occurs if the evidence that was allegedly withheld is merely cumulative to evidence presented at trial. State v. Church (Apr. 30, 1999), Clark App. No. 98-CA-36; State v. Aldridge (1997), 120 Ohio App.3d 122,145, 697 N.E.2d 228.
 {¶ 103} At trial, Trissel and Whittaker testified as to the individuals they had investigated. Trissel testified that he had participated in the interviewing of friends and family of the victims in order to find out more information about Jack and Linda and that there were a lot of suspects at the initial stage of the investigation. Trissel stated that he had investigated Amber Holscher, Linda's granddaughter and Damian's mother, and her husband, Jason. Trissel stated that Jason had made a violent threat toward Jack and Linda. Trissel also testified that he looked into Damian's natural father, Andrew Huffman, who had made "hostile actions" toward Linda because of Damian. In addition, Trissel testified that he had received information that Jack had made loans and had "repossessed some vehicles or something and people were upset about it, but I can't tell you exact names at this point." Trissel indicated that after interviewing some of these individuals, there was no basis to believe that they had committed the crime.
 {¶ 104} Whittaker likewise testified at trial that, on the morning of March 28, 2003, he "had no specific suspects but we had a list of people, if you will, that we needed to talk to." He stated: "There's two ways to look at this. Everyone can be a suspect early in the investigation because we really don't know who it is or there's no suspects." Whittaker testified that there were groups of people that they needed to investigate initially: family members, close friends, business associates. He explained:
 {¶ 105} "We needed to talk to them because they were family members, people that he associated with and people that Linda associated with. We — the communication with them was twofold and we need to inform and discuss with family members what has occurred, as well as get information about Jack and Linda from them and also try to find out where these people are because it's been my experience that in homicide investigations, they're rarely just strangers who showed up in the middle of the night, shot these people. There's got to be a motive usually and it's usually a lot of times domestic related issues associated with homicides."
 {¶ 106} Although Whittaker testified that Jack had business dealings "that would create some issues," the detectives did not interview business associates because evidence was mounting against Myers. Whittaker testified that he did not have a written list of suspects. On cross-examination, Whittaker testified that he had taken Jack's computer and given it to the crime lab. Whittaker indicated that, when he talked with the lab technician, he "provided him names of some of the people we were looking at at the time, I believe." Whittaker was unable at trial to identify the individuals whose names he had given to the crime lab.
 {¶ 107} At the end of the day on April 22, 2004, the court discussed the Brady issue with counsel and Whittaker. The prosecutor represented that he had provided defense counsel with a copy of everything in his file other than the physical exhibits, which defense counsel was able to view. The prosecutor further stated that he had spoken with investigating officers, including Whittaker, concerning whether there were any Brady orKyles materials not provided to the defense. He indicated that, in his opinion, there was no information not provided in discovery that would have a reasonable probability of leading to either exculpatory evidence or evidence favorable to the defense and, further, that he knew of nothing that had not already been provided to the defense. Several times prior to and during the trial, the prosecutor indicated that it had an open file policy and that it had made all known information available to the defense.
 {¶ 108} Whittaker stated to the court that he had information about the case that was "in his head" but that he had no reason to believe that there was any evidence that might make Myers less culpable or which might result in a less serious penalty. Whittaker indicated that there were other people who might have had a motive to commit the offenses but there was no evidence of any acts in furtherance of the crimes by other people or by co-conspirators. Whittaker was unable to provide specific names of individuals. At the end of the day on April 23, 2004, Whittaker was placed under oath and reaffirmed his prior statements.
 {¶ 109} On the record before us, Myers has not demonstrated that the prosecution failed to provide him with material evidence in violation of Brady and Kyles. It is undisputed that the state had an open file policy and that Myers had access to everything in the possession of the prosecutor. Although Myers complains that "[o]nly a few of the owners of the 11 seized vehicles on Jack's property were ever identified [and] [n]one of the identified owners of the vehicles were ever investigated," there is no evidence in the record that Myers could not have performed an independent investigation based on the information already provided by the state. Moreover, although Myers asserts that Whittaker failed to provide a list of suspects, the record indicates that the officers did not identify anyone (other than Myers) who may have been involved in the offenses. In other words, the record is devoid of evidence regarding the existence of other individuals who may have committed the crimes, and there is no evidence that the state failed to disclose evidence of their existence. While Myers may have preferred further investigation of Jack's business dealings, the detectives' failure to do so is not equivalent to withholding material information. Moreover, to the extent that Myers asserts that the state failed to provide evidence that would help establish that he was an "unwitting dupe by one or more others who actually committed the killings themselves," we are unpersuaded that Myers could not have obtained such information on his own. In sum, Myers has failed to demonstrate that the state violated the dictates of Brady and Kyles.
 {¶ 110} Myers further asserts that the state violated Brady
when it failed to inform him promptly that Jon Helmandollar had recently been arrested and would be coming to trial "in chains." Myers raised the issue prior to Helmandollar's testimony. In response, the court stated that it would provide defense counsel "an opportunity for a voir dire examination of Mr. Helmandollar in advance of his testimony so you can try to figure out what's going on." In addition, the court indicated that it would allow a broad scope of cross-examination vis-a-vis his recent incarceration. The court later reiterated that defense counsel could talk with Helmandollar before his testimony and would be given "lots of latitude" in their cross-examination. The court further asked the prosecutor to call the Miami County jail and obtain "some sort of record of why he's in custody." Although Myers claims in his brief that no records were provided, there is no evidence in the record that the state failed to comply with the court's request or that Myers's counsel were not able to speak to Helmandollar prior to his testimony the following day.
 {¶ 111} Upon review of the record, Myers was given ample opportunity prior to Helmandollar's testimony to ascertain the circumstances of his recent arrest. Although Myers unquestionably would have preferred to learn of Helmandollar's arrest earlier, we find nothing in the record to indicate that any material information regarding Helmandollar was undisclosed prior to his testimony or that the result of the proceeding would have been different had Myers obtained the information earlier.
 {¶ 112} The ninth assignment of error is overruled.
 {¶ 113} X. "CUMULATIVE ERRORS DEPRIVED APPELLANT OF A FAIR TRIAL."
 {¶ 114} Under Myers's tenth assignment of error, he argues that the cumulative weight of the errors denied him a fair trial. As discussed above, Myers's trial was not without error. However, none of the errors that we have identified were prejudicial to him. Although the Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus may warrant the reversal of his conviction, Statev. DeMarco (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus, upon a complete review of the record, we cannot conclude that prejudicial error exists in this case.
 {¶ 115} The tenth assignment of error is overruled.
 {¶ 116} The judgment of the trial court will be affirmed.
Brogan, J., and Fain, J., concur.